IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-03240-PAB-STV

DR. JOSEPH MICAH GOTTFRIED,

     Plaintiff,

v.

UNIVERSITY OF COLORADO HOSPITAL AUTHORITY, a body corporate and political subdivision of the State of Colorado,
POUDRE VALLEY MEDICAL GROUP, LLC, a Colorado corporation, d/b/a UCHealth Medical Group, and
POUDRE VALLEY HEALTH CARE, INC., a Colorado non-profit corporation, d/b/a Poudre Valley Hospital, Inc.,

     Defendants.

---

## ORDER

---

The matters before the Court are Defendants' Motion for Summary Judgment [Docket No. 74] and Defendants' Motion to Strike Evidence and Exhibits Submitted by Plaintiff in Response to Defendants' Motion for Summary Judgment [Docket No. 85]. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

On October 24, 2023, plaintiff Joseph Gottfried filed suit against defendants University of Colorado Hospital Authority and Poudre Valley Medical Group, LLC in the District Court for Larimer County, Colorado. Docket No. 5. On December 8, 2023, defendants removed the case to federal court. Docket No. 1. On February 2, 2024, plaintiff amended his complaint to add Poudre Valley Medical Group, Inc. as a defendant. Docket No. 26. On February 5, 2024, plaintiff filed his third amended complaint. Docket No. 29. In the third amended complaint, Dr. Gottfried, a psychiatrist,

alleges that defendants wrongfully terminated him because of his Parkinson's disease.
*Id.* at 3-4, ¶¶ 10-16. He brings claims for violations of the Americans with Disabilities
Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, violations of the Colorado Anti-
Discrimination Act ("CADA"), Colo. Rev. Stat. §§ 24-34-401, *et seq.*, and violations of
§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Id.* at 9-15, ¶¶ 60-96.

On December 20, 2024, defendants filed their motion for summary judgment.
Docket No. 74. Dr. Gottfried responded on January 10, 2025. Docket No. 76. Dr.
Gottfried filed an amended response on January 17, 2025. *See* Docket No. 82. On
January 24, 2025, defendants replied. Docket No. 86. That same day, defendants filed
a motion to strike certain evidence Dr. Gottfried relies on in his response to defendants'
motion for summary judgment. Docket No. 85. Dr. Gottfried responded to defendants'
motion to strike, Docket No. 90, and defendants replied. Docket No. 91. The Court will
first address defendants' motion to strike Dr. Gottfried's evidence.

## I.     MOTION TO STRIKE

On January 10, 2025, Dr. Gottfried responded to defendants' motion for
summary judgment. Docket No. 76. He amended his response on January 15, 2025.
Docket No. 82; Docket No. 96.[1] Dr. Gottfried's amended response denies several

---

[1] In his initial response, Dr. Gottfried requested that defendants' motion for
summary judgment be denied due to defendants' spoliation of evidence that he claims
may have been helpful to him at summary judgment. Docket No. 76 at 15. However,
Dr. Gottfried filed an unopposed motion to amend his response on January 17, 2025.
Docket No. 82. Dr. Gottfried attached a proposed amended response that removes his
arguments regarding defendants' alleged spoliation of evidence. Docket No. 82-2. The
Court granted the motion for leave to amend, Docket No. 95, and ordered that the
amended response be filed as a separate docket entry. In anticipation of the Court
granting the unopposed motion to amend, defendants' reply to the motion for summary
judgment and their motion to strike cite and address Dr. Gottfried's proposed amended
response to defendants' summary judgment motion. *See* Docket No. 86 at 1 n.2 (citing

assertions of undisputed fact made by defendants in their summary judgment motion.
*See* Docket No. 96 at 2-10.  The response also makes assertions of fact, both disputed
and undisputed.  *Id.*

In defendants' motion to strike, defendants ask the Court to strike some of the
evidence Dr. Gottfried relies on in his response to defendants' motion for summary
judgment.  *See* Docket No. 85.  Defendants argue that this evidence would be
inadmissible at trial.  *Id.*  They maintain that the Court should not only decline to
consider such evidence on summary judgment, but should also strike the evidence from
the record.  *See id.* at 8.

"Under Rule 12(f), Fed. R. Civ. P., the Court may strike material from pleadings,"
but a "motion for summary judgment is not a pleading."  *Turner v. Unified Gov't of
Wyandotte Cnty., Kansas City, Kansas*, 2020 WL 584456, at *1 (D. Kan. Feb. 6, 2020)
(citing Fed. R. Civ. P. 7(a) (pleadings include complaints, answers, replies to
counterclaim, answers to counterclaim, third-party complaints, and third-party
answers)); *Trujillo v. Bd. of Educ. of Albuquerque Pub. Schs.*, 230 F.R.D. 657, 660
(D.N.M. 2005) (motions and other papers are not pleadings)).  "Although a party may
object to summary judgment evidence that is inadmissible, a separate motion to strike is
not necessary or appropriate."  *Turner*, 2020 WL 584456, at *1 (citing Fed. R. Civ. P.
56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot
be presented in a form that would be admissible in evidence."); Fed. R. Civ. P. 56,
advisory committee's note to 2010 amend. ("There is no need to make a separate

---

Docket No. 82-2); Docket No. 85 at 2 n.1 (citing Docket No. 82-2).  Throughout this
order, the Court will cite Dr. Gottfried's docketed response.  Docket No. 96.

motion to strike.")); *see also* UT R USDCT CIV DUCivR 7-1(b)(1) ("A motion to strike evidence offered in another party's motion, response, or reply is improper.").

Defendants' motion to strike argues that Dr. Gottfried has failed to properly support his denials of defendants' assertions of material fact and has failed to properly support his assertions of disputed fact. *See* Docket No. 85 at 1-8. Therefore, defendants' arguments are based on Rule 56(c)(2) and should have been included in their reply. *See* Fed. R. Civ. P. 56(c)(2). Defendants' do not identify under what authority they ask the Court to strike Dr. Gottfried's evidence from the record. *See* Docket No. 85. Because defendants provide no support for the proposition that the Court should strike Dr. Gottfried's evidence, the Court will deny defendants' motion. Instead, the Court will consider defendants' arguments to the extent they are relevant in determining what facts are undisputed for purposes of ruling on the motion for summary judgment.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Undisputed Facts[2]

From 2003 to August 2022, Dr. Gottfried was employed as a psychiatrist at Mountain Crest Behavioral Health Center ("Mountain Crest"), a mental health center in Fort Collins, Colorado. Docket No. 74 at 2, ¶ 1. Pursuant to Dr. Gottfried's March 2021 Employment Agreement, Dr. Gottfried was employed by the Colorado Hospital Authority ("UCHA") and leased to Poudre Valley Medical Group, LLC ("UCHealth Medical Group"). *Id.* at 3, ¶ 2.

---

[2] The following facts are undisputed unless otherwise indicated.

Dr. Gottfried's 2020 performance review characterizes Dr. Gottfried as a "[h]igh quality physician with scholarly achievements" who "brings to bear sophisticated treatment strategies and great wit."[3]  Docket No. 96 at 6, ¶ 1.  Dr. Gottfried "kept up to date with the newest information in the field when it came to treating children and adolescents."  *Id.*, ¶ 2.  He was never subject to a formal written complaint or a performance review plan.  *Id.*, ¶ 3.  However, on May 19, 2022, defendants terminated Dr. Gottfried.  Docket No. 74 at 9, ¶ 50.

Dr. Gottfried was diagnosed with Parkinson's disease in 2012.  *Id.* at 4, ¶ 8. Shortly thereafter, Dr. Gottfried informed Dr. Kenneth Watanabe, Mountain Crest's Medical Director, of his diagnosis.  *Id.* at 3, 4, ¶¶ 5, 8.  In the summer of 2020, Dr. Gottfried began working in the adolescent inpatient unit.  *Id.* at 4, ¶ 9.  Dr. Gottfried and Dr. Rachel Rebecca jointly provided care for their patients.  *Id.*, ¶ 10.  Dr. Gottfried worked on a "7-day-on/7-day-off schedule."  *Id.*, ¶ 9.

Dr. Gottfried's motor skills and speech deteriorated in 2021, causing frequent falls, slurred speech, and difficulties with typing and dictating.  Docket No. 96 at 6, ¶ 4. Dr. Gottfried's motor skill deficiencies made "employees and administrators uncomfortable, creating an air of suspicion around him."[4]  *Id.*, ¶ 11.  Dr. Rebecca

---

[3] Dr. Gottfried asserts that it is an undisputed fact that he "was rated as 'Exceed Expectations' in his 2020 performance review."  Docket No. 96 at 6, ¶ 1.  Defendants deny this fact, arguing that Dr. Gottfried's overall rating was "Meets Expectations." Docket No. 86 at 3, ¶ 1.  The Court agrees that the "Exceeds Expectations" ratings in Dr. Gottfried's performance review are not for Dr. Gottfried's overall rating and that most of these ratings are self-reported by Dr. Gottfried.  *See* Docket No. 74-4.  Therefore, the Court finds that Dr. Gottfried's evidence does not support his assertion of fact, and the Court will not consider the fact that Dr. Gottfried received a rating of "Exceeds Expectations."

[4] Dr. Gottfried supports his assertion of fact with the declaration of Beckey Schlagel, who worked as a nurse with Dr. Gottfried for five years, until his transfer to

received a concerned comment to the effect that Dr. Gottfried sounded drunk or that he

was possibly on drugs because of his labored and slurred speech, which made him

hard to understand.[5]  *Id.*, ¶ 12.

---

inpatient care.  *Id.* (citing Docket No. 76-21).  In her declaration, Ms. Schlagel states
that she observed Dr. Gottfried's decline due to Parkinson's disease, "particularly
around late 2021 and early 2022."  Docket No. 76-21 at 2, ¶ 5.  She claims that "[t]here
was an air of suspicion around Dr. Gottfried's condition, with some staff and
administrators wrongly assuming he was intoxicated due to his Parkinson's symptoms."
*Id.*, ¶ 6.  Dr. Gottfried also attaches to his response the declaration of Madison Beasley,
a nurse and nurse practitioner student who closely interacted with Dr. Gottfried in 2021
and 2022.  Docket No. 76-19 at 1, ¶ 1.  Ms. Beasley states that she "noticed an
undercurrent of suspicions about Dr. Gottfried among nursing and mental health tech
staff, with some questioning whether he was intoxicated due to his speech and gait
issues."  *Id.* at 2, ¶ 9.  Defendants argue that the Court should not consider this
evidence because "Ms. Schlagel's and M[s]. Beasley's bare-boned, conclusory
statements regarding 'suspicion' (i.e., there was an 'air of suspicion' and 'undercurrent
of suspicion') and the mental impressions of other, unspecified employees, without any
corroborating record evidence, are not sufficient to create a genuine issue of fact."
Docket No. 85 at 4.  Defendants appear to argue that Dr. Gottfried's evidence lacks
sufficient foundation and is beyond the scope of Ms. Beasley's and Ms. Schlagel's
personal knowledge.  "A court should exclude testimony for lack of personal knowledge
only if . . . the witness could not have actually perceived or observed that which [s]he
testifies to."  *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014)
(citation and quotation omitted).  It is undisputed that Dr. Gottfried had a decline in his
motor skills and speech in 2021.  Docket No. 96 at 6, ¶ 4.  Ms. Schlagel and Ms.
Beasley worked with Dr. Gottfried during the relevant period, and their comments are
based on their perception of staff members' reactions to Dr. Gottfried's declining
physical capabilities.  As such, both appear to have observed the facts to which she is
testifying.  Therefore, the Court finds that Dr. Gottfried has properly supported this fact,
and the Court deems this fact to be undisputed.

[5] Dr. Gottfried asserts that "[s]everal providers including Dr. Rachel Rebecca had
received concerned comments to the effect that Dr. Gottfried sounded drunk."  Docket
No. 96 at 6, ¶ 12.  Dr. Gottfried does not explain who constitutes "providers."  *Id.*
Defendants "admit only that Dr. Rebecca heard adolescent patients make comments
about Plaintiff sounding or acting 'weird,' and that a patient's father complained he could
not understand Plaintiff and asked if he was drunk or high."  Docket No. 86 at 7, ¶ 12.
Defendants therefore appear to dispute that other "providers" received concerned
comments over Dr. Gottfried's speech.  Dr. Gottfried cites Ms. Schlagel's declaration, in

Dr. Rebecca had concerns about Dr. Gottfried's medical charting.[6]  Docket No. 74 at 4, ¶ 11.  She felt that his charting left her "in the dark" regarding the care he provided to their patients.  *Id.*  On multiple occasions in 2021, Dr. Rebecca spoke to Dr. Watanabe and Dr. David Sehr, the acting Medical Director of Inpatient Services, about Dr. Gottfried's deficient charting.  *Id.*, ¶ 12.  On August 5, 2021, Celeste Simmons, Mountain Crest's Director of Behavioral Health, emailed Elicia Bunch, Vice President of Behavioral Health, about the potential of Dr. Gottfried receiving an accommodation to support his charting.  *Id.*, ¶ 13.  Ms. Simmons stated that Dr. Gottfried "is very much cherished at Mountain Crest" and that she wanted "to approach this in a delicate manner to be supportive" of Dr. Gottfried.  *Id.*  When Dr. Watanabe met with Dr. Gottfried to discuss an accommodation, Dr. Gottfried expressed that charting was becoming more difficult due to his Parkinson's and agreed he needed an

---

which she states that "some staff and administrators wrongly assumed he was intoxicated."  Docket No. 76-21 at 2, ¶ 6.  The statement does not support the proposition that "providers" received complaints regarding Dr. Gottfried.  Dr. Gottfried also cites the deposition of Dr. Rebecca, in which she stated that a father of a patient "got angry" and asked "is this guy drunk?"  Docket No. 76-11 at 6, 30:12-14.  She claimed "[t]hat's the only time I heard that."  *Id.*, 30:14.  Therefore, the Court finds Dr. Gottfried's evidence supports his assertion of fact that Dr. Rebecca received a concerned comment about Dr. Gottfried, which defendants do not dispute.  However, Dr. Gottfried fails to support his assertion that other "providers" received concerned comments.  Therefore, the Court will not consider this assertion.

[6] The parties do not define "medical charting."  The Court will assume it refers to a physician's creation of a written record that notes information regarding a patient's care and descriptions of patient interactions.  *See* Anita Hedlund et al., *Introduction to Healthcare Professions: Introduction to Medical Charting*, ch. 12.4, https://openwa.pressbooks.pub/healthcare1/chapter/wa12-4/ (last visited May 13, 2025) ("Medical charting is the paper or electronic record of the patient's relationship with the healthcare organization.  This includes patient visit notes, lab results and imaging findings and correspondence between healthcare providers on the patient's care team. It also encompasses communications from the patient, authorizations, and interactions with the patient's third-party payer, such as government programs or private insurance carrier.").

accommodation.[7]  *Id.*, ¶¶ 14-15.  In September 2021, Dr. Gottfried met with Dr.

Watanabe and Dr. Sehr and agreed that a scribe would be a helpful accommodation.

*Id.*, ¶ 16.  Dr. Gottfried was concerned that, if the hospital was unable to accommodate

his disability, he might be terminated.[8]  Docket No. 96 at 7, ¶ 22.  Dr. Gottfried formally

requested an accommodation for a scribe on September 27, 2021, and the request was

approved in early November 2021.  Docket No. 74 at 5, ¶ 17.

On November 28, 2021, Dr. Rebecca sent an email regarding Dr. Gottfried's

charting to Dr. Watanabe, Dr. Sehr, and Ms. Simmons, stating, "I have to ask how much

longer this can go on. . . .  I have to be clear that I don't see a path forward with me

working opposite Joe anymore at this point, I'm very much done."  Docket No. 96 at 6,

¶ 6.  Dr. Rebecca also stated that Dr. Gottfried's signouts[9] and hard-to-read notes

created more work for her.  *Id.*, ¶ 9.

UCHA trained two behavioral health specialists to serve as scribes for Dr.

Gottfried, and he began using the scribes in December 2021 or January 2022.[10]  Docket

---

[7] In his response, Dr. Gottfried states that this assertion is "Partially Denied" and
that he "was initially uncomfortable with accommodation."  Docket No. 96 at 2, ¶ 15.  Dr.
Gottfried's denial is not responsive to defendants' assertion of fact.  Therefore, the
Court deems this fact to be undisputed.  Dr. Gottfried does not deny that he agreed with
Dr. Watanabe that he needed an accommodation.  *Id.*

[8] Dr. Gottfried claims it is undisputed that, "[e]ven before the accommodation was
set up, Plaintiff expressed concern that he may be terminated if the accommodation
turned out to be too onerous."  Docket No. 96 at 7, ¶ 22.  To support this assertion, Dr.
Gottfried relies on an email from a New York Life Insurance agent to Katherine
Velasquez stating that Dr. Gottfried expressed concerns that an accommodation in
which he would take a reduced number of patients might jeopardize his job because it
would force defendants to hire another care provider.  *See* Docket No. 76-28.  This
does not support the proposition that Dr. Gottfried was concerned that using a scribe
would put his job at risk.

[9] The parties do not define the term "signouts."

[10] Dr. Gottfried "partially denie[s]" this fact.  Docket No. 96 at 2, ¶ 18.  He states
that the "scribes did not resolve his charting issues" and that he had to train the scribes

No. 74 at 5, ¶¶ 18, 19.  The costs of a scribe were not covered by insurance, but

defendants "devised a workaround."  Docket No. 96 at 8, ¶ 26.  In an email sent on

December 1, 2021, Ms. Simmons stated that "it was suggested to use one of our

Behavioral Health Specialists in this role for immediate coverage."  *Id.*  Dr. Rebecca

stated that the behavioral health technicians provided to Dr. Gottfried to work as scribes

were not qualified and that he needed more help.[11]  *Id.*, ¶ 27.  The scribes were not

always available to Dr. Gottfried because overtime restrictions did not permit the scribes

to work twelve-hour shifts.[12]  *Id.* at 9, ¶ 9.

---

on "what the terminology meant."  *Id.*  Although Dr. Gottfried appears to dispute the
adequacy of his scribes' training, he does not dispute that he was given two scribes as
an accommodation or that they received training.  Therefore, the Court deems this fact
to be admitted.

[11] Defendants argue that Dr. Gottfried has failed to properly support this fact.
Docket No. 86 at 5, ¶ 27.  However, Dr. Gottfried cites to portions of Dr. Rebecca's
deposition in which she states that medical scribes require certifications that medical
technicians do not require and that she felt defendants should have done more to help
Dr. Gottfried, such as provide them both with a physician's assistant.  Docket No. 76-11
at 11-13, 61:8-25, 76:25-77:21.  As such, it is undisputed that Dr. Rebecca believed the
medical scribes were unqualified and Dr. Gottfried needed more help.

[12] Dr. Gottfried asserts that defendants "were very concerned about the costs of
the clinic's operation."  Docket No. 96 at 10, ¶ 10.  He cites to a portion of his deposition
transcript that is not included in the exhibit he submitted to the Court.  *See* Docket No.
76-4 at 4-5 (skipping from deposition page 102 to page 127).  Dr. Gottfried also cites
notes from an interview given by Ms. Schlagel to the Colorado Civil Rights Division.
Docket No. 76-30.  Defendants assert that the Court should not consider these interview
notes because they are hearsay.  Docket No. 85 at 5-6.  Dr. Gottfried responds that
these notes fall within the public records exception under Federal Rule of Evidence
803(8).  Docket No. 90 at 7.  Regardless of whether Dr. Gottfried's evidence is
admissible, nothing in the notes refers to the cost of accommodating Dr. Gottfried's
disability or the clinic's operating costs.  Docket No. 76-30.  Therefore, Dr. Gottfried's
assertion that defendants were very concerned about the costs of the clinic's operation
does not appear to be unsupported.  Nevertheless, defendants agree that it is
undisputed that defendants "sought to minimize the clinic's costs."  Docket No. 86 at 7,
¶ 10.  Therefore, the Court finds that there is a dispute of fact regarding the extent of
defendants' concerns over the costs of the clinic's operation.

Dr. Watanabe audited Dr. Gottfried's charts in March 2022.[13]  *Id.* at 6, ¶ 7.  On

May 6, 2022, Dr. Gottfried stated that using scribes had resulted "in a much more

efficient manner [of] providing the documentation required for caring for my patients."[14]

Docket No. 74 at 5, ¶ 21.  Dr. Gottfried never communicated to defendants' employees

that the scribes were inadequate.[15]  *Id.*, ¶ 22.

Ms. Simmons saw Dr. Gottfried fall in the cafeteria.[16]  Docket No. 96 at 9, ¶ 2.

---

[13] Dr. Gottfried asserts that these audits were in response to further complaints from Dr. Rebecca about his charting, Docket No. 96 at 6, ¶ 7, but he provides no evidence that Dr. Rebecca complained about Dr. Gottfried's charting in March 2022.

[14] Defendants assert that "Dr. Watanabe and Plaintiff believed the scribes sufficiently accommodated Plaintiff's disability."  Docket No. 74 at 5, ¶ 20.  Defendants rely on a series of emails between Dr. Watanabe, Dr. Gottfried, and Kelly McFerrin to support their assertion of fact.  *Id.* (citing Docket No. 74-13).  However, in the emails, Dr. Watanabe expresses no opinion about the adequacy of Dr. Gottfried's accommodation, and Dr. Gottfried states only that the scribes have been helpful, not that they are a sufficient accommodation.  Docket No. 74-13.  Defendants have therefore failed to support their assertion of fact.

[15] Dr. Gottfried denies this fact.  Docket No. 96 at 3, ¶ 22.  Dr. Gottfried relies on his deposition testimony in which he states that he was worried about his job and that "I was already stretching their – their helping me out.  I didn't want to push it."  *Id.* (quoting Docket No. 76-4 at 9, 135:21-23).  Dr. Gottfried's denial is unresponsive to defendants' assertion of fact, and this fact is deemed undisputed.

[16] Dr. Gottfried asserts that, after she saw Dr. Gottfried fall, Ms. Simmons "laughed and joked about it in a very degrading manner."  Docket No. 96 at 9, ¶ 2.  To support this assertion, Dr. Gottfried relies on his deposition testimony.  *Id.*  During his deposition, Dr. Gottfried stated that, after he was terminated, he had a conversation with Jennifer Paxton, who told him that Ms. Simmons joked about his fall.  Docket No. 76-4 at 26, 183:3-12.  Defendants maintain that Dr. Gottfried has failed to properly support his claim that Ms. Simmons joked about his fall because Dr. Gottfried relies on hearsay.  Docket No. 85 at 8; Docket No. 86 at 6, ¶ 2.  Dr. Gottfried acknowledges his assertion is based on hearsay, but states that Ms. Paxton will testify at trial regarding Ms. Simmons' conduct.  Docket No. 90 at 10-11.  Defendants reply that Dr. Gottfried's offer to have Ms. Paxton testify at trial does not cure his failure to support his assertion of fact because there is no evidence regarding what Ms. Paxton is likely to say at trial.  Docket No. 91 at 10 n.7.  The Court agrees.  Dr. Gottfried's only evidence that Ms. Simmons mocked him is hearsay, and hearsay "testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment."  *Buettner v. N. Oklahoma Cnty. Mental Health Ctr.*, 158 F. App'x 81, 84 (10th Cir. 2005) (unpublished)

Ms. Simmons's demeanor towards Dr. Gottfried changed after she saw him fall and after Dr. Gottfried began using scribes.[17]  *Id.*, ¶ 3.

Dr. Gottfried permitted an adolescent patient to call his grandmother during treatment.  *Id.*, ¶ 4.  This was not normal practice, but it was a recognized practice.  *Id.* Dr. Rebecca had a difference of opinion regarding Dr. Gottfried's choice to allow the patient to call his grandmother and brought the issue to Ms. Simmons' attention.  *Id.* Ms. Simmons raised the issue with Dr. Watanabe and Dr. Sehr, "forcing a Record of Conversation."  *Id.*

On May 4, 2022 and May 6, 2022, Melissa Tuck, who appears to be a behavioral health manager,[18] emailed Dr. Watanabe, sharing complaints that Dr. Gottfried was taking too long in his treatment team meetings.[19]  Docket No. 96 at 7, ¶ 20.  On May 9, 2022, Dr. Rebecca complained again about Dr. Gottfried.  *Id.* at 6, ¶ 8.

In the years preceding Dr. Gottfried's termination, Dr. Gottfried was twice counseled for engaging in offensive conduct related to rape.[20]  Docket No. 74 at 3, ¶ 3.

---

(citing *Thomas v. IBM,* 48 F.3d 478, 485 (10th Cir. 1995)).  Therefore, the Court will not consider Dr. Gottfried's assertion that Ms. Simmons joked about Dr. Gottfried's fall.

[17] Dr. Gottfried claims that Ms. Simmons's demeanor changed because "he no longer met her standard of what a psychiatrist was."  Docket No. 96 at 9, ¶ 3.  Dr. Gottfried relies on hearsay and speculation to support his contention that Ms. Simmons's change in attitude towards Dr. Gottfried was because of his fall or his disability.  *See id.*; Docket No. 76-4 at 11, 139:1-25 (relying on post-termination conversation with Ms. Paxton).  As such, the Court will not consider Dr. Gottfried's assertion that Ms. Simmons's changed demeanor was due to his fall or the use of a scribe.

[18] *See* Docket No. 76-27 at 2.

[19] Treatment team meetings appear to be meeting in which physicians discuss patients with other medical staff.  *See* Docket No. 76-27.

[20] Dr. Gottfried denies that these incidents involved "offensive conduct related to rape."  Docket No. 96 at 2, ¶ 3.  Defendants cite two records of conversation in which Dr. Watanabe states that he had a conversation with Dr. Gottfried about comments Dr. Gottfried had made that involved rape and were "deemed offensive" to a least one other

In July 2018, during a work conference, Dr. Gottfried joked that "no means yes" and that there is no rape in marriage.[21]  *Id.*, ¶ 4.  Dr. Watanabe warned Dr. Gottfried that Dr. Gottfried must "immediately demonstrate restraint and wisdom" in his communications and that any further violations of UCHealth Medical Group's code of conduct could result in corrective action, up to and including termination.  *Id.*, ¶ 5.  On July 2020, Dr. Gottfried made an offensive comment about rape in a group text message with approximately thirteen colleagues, stating "[w]hoever it is, no raping (wink wink)" with an emoji blowing a kiss.  *Id.*, ¶ 6.  Dr. Watanabe again warned Dr. Gottfried in a record of conversation that further violations could result in corrective action, up to and including termination.  *Id.*  Dr. Gottfried's 2020 performance evaluation states that Dr. Gottfried "needs to immediately address his penchant for making remarks that are not appropriate.  He needs to have better awareness of his audience.  When in doubt, he should say nothing."[22]  *Id.*, ¶ 7.

In February 2022, Dr. Gottfried discussed with Ms. Simmons the possibility of incorporating the concept of catharsis realism into the treatments offered by Mountain Crest, and Ms. Simmons did not object to the possibility.[23]  Docket No. 96 at 9, ¶ 6.

---

participant in the conversation.  Docket No. 74-2 at 3–5.  Therefore, it is undisputed that Dr. Gottfried was twice counseled regarding rape related comments deemed to be offensive.

[21] Dr. Gottfried denies defendants' characterization of his comments.  Docket 96 at 2, ¶¶ 4-6.  However, defendants' assertion of undisputed fact accurately reflects the records of conversation between Dr. Gottfried and his supervisor.  *See* Docket No. 74-2.  Dr. Gottfried does not deny that he made the comments discussed during the conversation, as reflected in the records of conversation.  This fact is therefore deemed undisputed.

[22] Dr. Gottfried denies this fact, but defendants accurately quote Dr. Gottfried's 2020 performance evaluation.  *See* Docket No. 74-4 at 4.

[23] Dr. Gottfried asserts that he "discussed the video with Celeste Simmons and Melissa Tuck, in February 2022" and that neither "objected to the idea of possibly

Catharsis realism, wherein an individual reenacts a traumatic situation, is an artistic film genre developed by Dr. Gottfried's niece, Claire Chubbuck.[24]  Docket No. 74 at 5, ¶ 24. Catharsis realism is not a recognized therapeutic treatment[25] and was not created by

---

incorporating the concept of cathartic realism into the treatments offered by Mountain Crest."  Docket No. 96 at 9, ¶ 6.  The video refers to the short film "How I Lost My Virginity," described below.  Defendants dispute that (1) Dr. Gottfried had such a conversation with Ms. Tuck in February 2022, and (2) that Dr. Gottfried specifically discussed the short film with Ms. Simmons.  Docket No. 86 at 6, ¶ 11.  Defendants deny that Dr. Gottfried spoke with Ms. Tuck, claiming that Dr. Gottfried instead spoke with Melissa Brewster.  *Id.* at 2 n.4, 6, ¶ 11.  Defendants cite Dr. Gottfried's interrogatory responses, where he states that the individual whom he spoke to in February 2022 was Ms. Brewster.  *See* Docket No. 86-2 at 13.  The Court finds that there is a dispute of fact as to whether Dr. Gottfried discussed the video with Ms. Tuck in February 2022. Defendants do not deny that Dr. Gottfried discussed catharsis realism with Ms. Simmons, but deny that the two discussed the video.  Docket No. 86 at 6, ¶ 11. Therefore, the Court finds that it is undisputed that Dr. Gottfried discussed the catharsis realism with Ms. Simmons in February 2022.  However, the Court finds that there is a dispute of fact as to whether Ms. Simmons and Dr. Gottfried discussed the video. Although not undisputed, the parties' evidence appears to indicate that Dr. Gottfried's sister, Ivana Chubbuck, is an acting teacher who has developed an acting technique, which she calls the Chubbuck acting technique, whereby students rely on past traumatic experiences as part of their acting performance.  *See* Docket No. 76-4 at 13, 149:4-7; Docket No. 86-2 at 14 (Dr. Gottfried "recalls in the winter of 2022 he was talking with Celeste Simmons about PTSD, and he mentioned his sister found a technique that supports dissipation of PTSD symptoms with drama therapy.").  Catharsis realism appears to be a description of the art developed using the Chubbuck acting technique. *See* Docket No. 74-1 at 12, 145:11-146:22.  As discussed below, Claire Chubbuck, Ivana Chubbuck's daughter and Dr. Gottfried's niece, appears to have directed a film based on the Chubbuck acting technique, and the film is therefore an example of catharsis realism.  *See id.*

[24] *See* Docket No. 76-4 at 13, 149:4-7.

[25] Dr. Gottfried assert that catharsis realism "incorporates proven scientific methods for addressing trauma and has the potential to effectively treat patients without re-traumatizing them."  Docket No. 96 at 10, ¶ 12.  Dr. Gottfried supports this assertion with his own declaration in which he reviews the literature and psychological principles that support catharsis realism as a potential treatment for PTSD.  *See* Docket No. 76-32.  Defendants argue that the Court should not consider Dr. Gottfried's declaration because it provides expert opinions despite Dr. Gottfried not being disclosed as an expert under Rule 26.  *See* Docket No. 85 at 6-7; *see also* Fed. R. Civ. P. 26(a)(2)(A) ("In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."); Fed. R. Civ. P. 37(c)(1) ("If a party fails to

anyone with medical or therapeutic expertise.[26]  *Id.*  Ms. Simmons did not deter Dr.

Gottfried in his interest in catharsis realism or suggest that sharing further about

catharsis realism could constitute sexual harassment.[27]  Docket No. 96 at 9, ¶ 7.

In approximately April 2022, Dr. Gottfried began discussing catharsis realism and

a short film entitled "How I Lost My Virginity" with multiple female employees at

---

provide information or identify a witness as required by Rule 26(a) or (e), the party is not
allowed to use that information or witness to supply evidence on a motion, at a hearing,
or at a trial, unless the failure was substantially justified or is harmless.").  Dr. Gottfried
claims that his declaration does not provide expert testimony.  Docket No. 90 at 9.
Instead, it attempts "to articulate all of the reasons and bases for his belief in the
Cathartic Realism theory, providing context for bringing up the theory and video to co-
workers."  *Id.*  Nothing in Dr. Gottfried's declaration addresses the context in which he
discussed catharsis realism at his work.  *See* Docket No. 76-32.  The declaration
provides opinions about the potential efficacy of catharsis realism as a treatment for
trauma, citing eleven scientific publications.  *Id.*  Moreover, the declaration
demonstrates that Dr. Gottfried's opinions are based on his expertise as a psychiatrist.
*Id.*  Finally, Dr. Gottfried's assertion of fact, which the declaration supports, is an
assertion regarding catharsis realism as a treatment, not about the context in which he
shared the video at work.  Although it is not improper for Dr. Gottfried to rely on his own
expertise, *see Mathison v. Wilson*, No. 14-cv-03345-RM-KLM, 2017 WL 4227243, at *3
(D. Colo. Mar. 21, 2017) ("The fact that an expert witness is also a party does not
preclude qualification as an expert."), "*all* witnesses who are to give expert testimony
under the Federal Rules of Evidence must be disclosed under Rule 26(a)(2)(A).  *Musser
v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004).  Because Dr. Gottfried was
not disclosed as an expert, the Court will not consider his expert opinions on the
efficacy of catharsis realism.  Fed. R. Civ. P. 37(c)(1).  Therefore, Dr. Gottfried's
assertion that catharsis realism incorporates proven scientific methods is not properly
supported and the Court will not consider this fact.
    [26] Dr. Gottfried denies this fact, stating that the "components of Cathartic Realism
are based on recognized theories and psychological treatments."  Docket No. 96 at 3,
¶ 24.  Dr. Gottfried does not deny any portion of defendants' assertion of fact, and this
fact is deemed undisputed.
    [27] Dr. Gottfried's assertion of fact identifies Ms. Simmons as his supervisor.
Docket No. 96 at 9, ¶ 7.  Defendants dispute whether Ms. Simmons is Dr. Gottfried's
supervisor.  Docket No. 86 at 6, ¶ 7.  The Court agrees that Dr. Gottfried has failed to
support his assertion that Ms. Simmons is his supervisor.  *See* Docket No. 76-5 at 1,
¶ 1.

Mountain Crest, including Ms. Simmons, Megan Wherry,[28] and at least one other

employee.[29]  Docket No. 74 at 5, ¶ 23.  "How I Lost My Virginity," which is an example

of catharsis realism, depicts a teenage woman being stalked, kidnapped, and raped.[30]

*Id.*, ¶ 25.

On April 23, 2022, Dr. Gottfried emailed Ms. Wherry a link to the video.[31]  *Id.* at 6,

¶ 26.  Ms. Wherry did not ask to be sent the video, did not watch the video, and was not

aware of the name of the video or its subject matter.[32]  *Id.*, ¶ 27.  In sending the video

link to Ms. Wherry, Dr. Gottfried was intending to have a serious professional dialogue

---

[28] Ms. Wherry appears to be an occupational therapist at UCHealth Medical Group.  *See* Docket No. 74-16.

[29] Dr. Gottfried maintains that he first began discussing catharsis realism with Ms. Simmons and Ms. Tuck in January 2022.  Docket No. 96 at 3, ¶ 23.  However, Dr. Gottfried provides no support for this proposition.  The interrogatory that he cites does not address when he began discussing catharsis realism and he fails to include the cited part of his deposition.  *See* Docket No. 76-26; Docket No. 76-4.  It is undisputed that Dr. Gottfried spoke with Ms. Simmons about catharsis realism in February 2022.  Docket No. 96 at 9, ¶ 6.

[30] Defendants provide a copy of the video.  Docket No. 74-15.  Dr. Gottfried does not dispute that defendants have produced an accurate copy of the video to the Court, and the video matches the video Dr. Gottfried cites in a footnote.  *See* Docket No. 96 at 14 n.4.  The film's credits indicate that the script of the short film was written by a victim of rape and that she is the lead actress.  *See* Docket No. 74-15.  The film recreates the circumstances of her rape.  *Id.*  The video is approximately fifteen minutes long.  It includes a sequence of shots lasting approximately one minute that shows the victim and the perpetrator from the chest up.  *Id.*  The sequence includes several indications that the victim is being raped, including the victim crying and her hands being restrained by the perpetrator.  *Id.*

[31] Dr. Gottfried denies this fact, saying "Dr. Gottfried wanted feedback on the Chubbuck Method and Wherry was 'willing to learn about . . . what it entails.'"  Docket No. 96 at 3, ¶ 26.  Dr. Gottfried's denial is unresponsive to the assertion of fact and this fact is deemed undisputed.

[32] Dr. Gottfried denies this fact by highlighting portions of Ms. Wherry's deposition in which she states that there were informal conversations regarding the video that she does not remember clearly.  Docket No. 96 at 3, ¶ 26 (citing Docket No. 76-8 at 3, 24:19-20).  He claims that Ms. Wherry could have asked for the video link during these unremembered conversations.  *Id.*  Dr. Gottfried produces no evidence that Ms. Wherry asked to be sent the video, and the fact is deemed undisputed.

with a colleague about a work-related treatment modality.  Docket No. 96 at 9, ¶ 5.  Ms.

Wherry was not uncomfortable.  *Id.*

On May 5, 2022, Dr. Gottfried began to tell Sierra Schuckert[33] about catharsis

realism and the video.  Docket No. 74 at 6, ¶ 28.  Ms. Wherry forwarded the video link to

Ms. Schuckert and another employee, Jade Studee.[34]  *Id.*, ¶ 30.[35]  Ms. Schuckert

emailed her manager, Ms. Tuck, stating, "I'm completely unsure why Dr. Gottfried asked

this be forwarded to me, I wasn't included in the conversation around what the purpose

is of this video."[36]  *Id.*, ¶ 32.[37]  Ms. Schuckert deleted a smiley face included by Ms.

---

[33] Sierra Schuckert appears to be another physician and the head of the outpatient groups.  *See* Docket No. 74-1 at 14, 155:19-156:4.

[34] Although Dr. Gottfried claims that he does not know who Ms. Studee is, Docket No. 96 at 4, ¶ 30, defendants' evidence demonstrates that the email sending Ms. Schuckert a link to a website where the video was stored was also sent to Ms. Studee.  Docket No. 74-16.

[35] Defendants assert that it is undisputed that Dr. Gottfried "was having difficulty sending the video to Ms. Schuckert, so asked Ms. Wherry, who was working nearby, to forward the video link to Ms. Schuckert."  Docket No. 74 at 6, ¶ 29.  Mr. Gottfried denies this fact, arguing that Ms. Wherry testified "I don't remember if I offered to send or if he asked me to send it, but because we both knew I had it in my email, and because of the nature of who I am, I'm a helper, I said, I will just send it, so we can be done with all this hullaballo, and I can be done with my work and go get my kids."  Docket No. 96 at 3-4, ¶ 19.  Therefore, the Court finds that there is a dispute of fact as to whether Dr. Gottfried asked Ms. Wherry to send Ms. Schuckert the video.

[36] Dr. Gottfried denies this fact on the basis that the email chain is incomplete. Docket No. 96 at 4, ¶ 32.  However, defendants accurately quote the email sent from Ms. Schuckert to Ms. Tuck.  Docket No. 74-17.

[37] Defendants assert that it is undisputed that, after Ms. Wherry forwarded her the video, "Ms. Schuckert began watching the video with another employee, Mattie Weadon, and both quickly became uncomfortable with the video's contents."  Docket No. 74 at 6, ¶ 31.  Ms. Weadon appears to be a care coordinator for the inpatient unit. *See* Docket No. 74-3 at 9, 43:17-18.  Defendants support their assertion by citing the deposition of Dr. Watanabe, in which he states that Ms. Schuckert and Ms. Weadon told him that they were uncomfortable watching the video at work.  Docket No. 74-3 at 9, 44:17-22.  Defendants also cite an email from Ms. Schuckert to Ms. Tuck in which Ms. Schuckert says that "Mattie asked that I forward you this video from Dr. Gottfried." Docket No. 74-17.  Dr. Gottfried denies this fact on the basis that the email "only shows that Sierra Schu[c]kert was sent the video link."  Docket No. 96 at 4, ¶ 31.  The fact that

Wherry from the email chain Ms. Schuckert sent to Ms. Tuck.  Docket No. 96 at 8, ¶ 25.

Ms. Tuck reported the complaint to Ms. Simmons, who reported it to Dr. Watanabe that

same day.  Docket No. 74 at 6, ¶ 33.

On May 7, 2022, Dr. Watanabe, who was very angry, met with Dr. Gottfried and

told him he must immediately "cease and desist" and that "this" could be a "real

problem." *Id.*, ¶ 35.  At the meeting, Dr. Gottfried admitted sending the video link to Ms.

Wherry.[38]  *Id.* at 7, ¶ 36.  Later that day, Dr. Gottfried sent Dr. Watanabe an email

explaining his actions and how he believed catharsis realism may have therapeutic

benefits.  *Id.*, ¶ 37.  Dr. Watanabe sent a description of what happened and the text of

Dr. Gottfried's email explanation to a Human Resources representative, stating:

> At worst, this is heinous and corrective action/termination needs to be
> considered.  At best, [Dr. Gottfried] has exercised such terrible judgment in
> sending such links without laying the groundwork and context of this video being
> used as some sort of therapy.  He had previously been counseled regarding
> sexual harassment.

---

only Ms. Schuckert was sent the video link does not refute the fact that Ms. Weadon
saw the video.  Moreover, the email indicates that Ms. Schuckert sent the email at Ms.
Weadon's request.  However, the only support defendants provide for the proposition
that Ms. Schuckert and Ms. Weadon were made uncomfortable by watching the video is
hearsay regarding what Ms. Schuckert and Ms. Weadon told Dr. Watanabe in an
interview.  Docket No. 74-3 at 9, 44:17-22.  Because defendants fail to properly support
their assertion that Ms. Schuckert and Ms. Weadon were made uncomfortable watching
the video, the Court will not consider this fact.

[38] Dr. Gottfried denies this fact, explaining that he "admitted he sent the video link
to Ms. Wherry, which he did after a Zoom meeting they had together with Claire and
Ivana Chubbuck."  Docket No. 96 at 4, ¶ 36 (citing Docket No. 76-4 at 13, 149:4-7).  Dr.
Gottfried's explanation does not deny defendants' assertion of fact and the fact is
deemed undisputed.  Moreover, Dr. Gottfried's attempt to include additional undisputed
facts in his response regarding the meeting between Ms. Wherry, Dr. Gottfried, his
niece, and his sister is improper because defendants are under no obligation to respond
to this assertion of fact.  Instead, such facts should have been included in Dr. Gottfried's
section of additional undisputed facts.  *See* Practice Standards (Civil Cases), Chief
Judge Philip A. Brimmer, § III.F.3.b.iv.

*Id.*, ¶ 38.  Dr. Watanabe's email, including a link to the video, was sent to Dr. Jenny

Bajaj, UCHealth Medical Group's Chief Medical Officer.  *Id.*, ¶ 39.  Dr. Bajaj found the

video "extremely concerning."  *Id.*

      Dr. Watanabe, in consultation with Dr. Bajaj, continued his investigation into Dr.

Gottfried's conduct.  *Id.*, ¶ 40.  On May 10, 2022, Dr. Watanabe interviewed Ms. Tuck,

Ms. Wherry, Ms. Weadon, and Ms. Schuckert regarding the "How I Lost My Virginity"

video.  *Id.*  Dr. Watanabe was informed that Dr. Gottfried had asked Ms. Wherry to

forward the video to Ms. Schuckert and Ms. Studee and that, after Ms. Schuckert and

Ms. Weadon watched part of the video together, they "became apprehensive about the

content" and together decided to forward the video to Ms. Tuck.[39]  *Id.* at 8, ¶ 41.  Dr.

Watanabe learned that the video had been seen by Desirae Wahlert,[40] an

administrative employee.  *Id.*, ¶ 42.  Dr. Watanabe interviewed Ms. Wahlert, who told

Dr. Watanabe that Dr. Gottfried had shown Ms. Wahlert the video on his laptop and that

this made her very uncomfortable.[41]  *Id.*, ¶ 43.  Dr. Watanabe generated a single page

---

[39] Although Dr. Gottfried appears to contest whether Dr. Gottfried in fact asked Ms. Wherry to forward the video to Ms. Schuckert and Ms. Studee, Dr. Gottfried does not deny that it was reported to Dr. Watanabe that he had requested Ms. Wherry to do so.  *See* Docket No. 96 at 4, ¶ 41.

[40] Dr. Gottfried asserts that "Ms. Walhert had made comments to other staff that Dr. Gottfried had a 'weird walk' and that he was an 'anomaly' and a 'nonentity.'"  Docket No. 96 at 9, ¶ 8.  Dr. Gottfried again relies on hearsay from Ms. Paxton.  Docket No. 76-4 at 30, 193:12-13.  Therefore, the Court will not consider this fact.

[41] Dr. Gottfried denies this fact, stating that he "has no knowledge of whether this interview took place."  Docket No. 96 at 4, ¶ 43.  Dr. Gottfried's personal knowledge of this interview is irrelevant.  Defendants properly support this assertion of fact with an email from Dr. Watanabe to Dr. Bajaj regarding his interview with Ms. Wahlert.  *See* Docket No. 74-22.  Therefore, that Dr. Watanabe interviewed Ms. Wahlert, who told him that Dr. Gottfried showed her the video on his laptop, is deemed undisputed.

of interview notes.  Docket No. 96 at 7, ¶ 23.  Defendant's investigation did not include a

forensic computer investigation.[42]  *Id.*

Dr. Watanabe reported his findings to Dr. Bajaj, noting that Ms. Wahlert was not

a therapist and played no role in developing patient treatment programs.  Docket No. 74

at 8, ¶ 44.  Dr. Watanabe told Dr. Bajaj that Dr. Gottfried "did not express any remorse

around [showing the video] or even understand the seriousness of showing events like

this to somebody else without any context -- forwarding the video without any context."[43]

*Id.*  Dr. Watanabe did not interview Dr. Gottfried after interviewing Ms. Wahlert or the

other witnesses.  Docket No. 96 at 7, ¶ 21.

Dr. Bajaj consulted a psychiatrist at the University of Colorado School of

Medicine for their opinion on catharsis realism's potential as a therapeutic method, and

the psychiatrist was horrified that Dr. Gottfried had shared the video and told her that

"this kind of approach is not a recognized treatment modality for post-traumatic stress

disorder."  Docket No. 74 at 8, ¶ 45.

Dr. Bajaj and Dr. Watanabe spoke on several occasions regarding the video and

the conclusions of the investigation, "including that catharsis realism was not a

recommended treatment modality, [Dr. Gottfried's] lack of understanding and remorse

regarding the seriousness of his conduct, and their concerns for the people (all of whom

---

[42] Dr. Gottfried asserts that defendants' investigation was conducted over a 24-hour period.  Docket No. 96 at 7, ¶ 23.  Defendants deny this fact on the basis that Dr. Watanabe interviewed Dr. Gottfried on May 7, 2022 and continued to interview other employees until May 11, 2022.  Docket No. 86 at 5, ¶ 23.  Therefore, the Court finds that there is a dispute of fact as to the period of defendants' investigation.

[43] Dr. Gottfried denies this fact on the basis that the assertion omits the fact that "Dr. Watanabe never followed up with Dr. Gottfried about the allegation that he showed Ms. Wahlert the video."  Docket No. 96 at 4, ¶ 44.  Dr. Gottfried does not deny any part of defendants' assertion of fact, and this fact is deemed undisputed.

are women) who watched the video, particularly because they may have personal

experiences (such as sexual assault) which may make watching the video more

difficult."[44]  *Id.* at 8-9, ¶ 46.[45]  Dr. Bajaj relied on Dr. Watanabe's investigation and did

not verify the facts reported to her by Dr. Watanabe.[46]  Docket No. 96 at 7, ¶ 16.

Because Dr. Gottfried had been warned regarding sexual harassment on two prior

occasions and they did not feel that a lesser action would correct the issue, Dr.

Watanabe and Dr. Bajaj agreed that termination was appropriate.[47]  Docket No. 74 at 9,

¶ 47.  Ms. Simmons did not participate in the termination decision.  *Id.*, ¶ 48.[48]  Dr.

---

[44] Dr. Gottfried denies this fact.  Docket 96 at 5, ¶ 46.  He states that Dr. Bajaj's assertion that these conversations with Dr. Watanabe occurred cannot be independently verified.  Docket 96 at 5, ¶ 46.  Dr. Gottfried provides no support for the proposition that Dr. Bajaj's deposition testimony is insufficient to demonstrate that Dr. Bajaj discussed Dr. Gottfried's conduct with Dr. Watanabe.  Therefore, this fact is deemed undisputed.

[45] The parties dispute whether Dr. Gottfried's conduct violated defendants' policies prohibiting "all forms of harassment and conduct which are considered offensive, aggressive, intimidating, threatening, racist, sexist, coercive, abusive or disruptive."  Docket No. 86 at 4, ¶ 19; Docket No. 96 at 7, ¶ 19.

[46] Dr. Gottfried asserts that "Dr. Bajaj, Medical Director who supervised Dr. Watanabe's investigation, relied solely on Dr. Watanabe's reports and did not verify any information."  Docket No. 96 at 7, ¶ 16.  Defendants deny this fact, stating that "Dr. Bajaj testified she watched the video and consulted a psychiatrist regarding catharsis realism's potential as a therapeutic method."  Docket No. 86 at 4, ¶ 16.  However, Dr. Bajaj testified that she did not interview anyone other than Dr. Watanabe regarding Dr. Gottfried's conduct and did not verify any of the facts reported to her by Dr. Watanabe.  *See* Docket No. 76-25 at 5-6, 68:14-69:2.  Therefore, it is undisputed that Dr. Bajaj relied solely on the facts presented to her by Dr. Watanabe's reports.

[47] Dr. Gottfried denies this fact without explanation.  Docket No. 96 at 5, ¶ 47.  Instead, he appears to incorporate by reference his denials of the fact that he was twice reprimanded for discussing rape a work, which denials the Court has rejected.  *See id.* at 2, ¶¶ 3, 5.  Therefore, the Court deems this fact to be admitted.

[48] Dr. Gottfried denies this fact.  Docket No. 96 at 5, ¶ 48.  He states that "Celeste Simmons was involved in the reporting chain related to the investigation as a leader in the clinic."  *Id.*  Dr. Gottfried does not explain how Ms. Simmons was "involved in the reporting chain."  *Id.*  At most, this claim indicates that Ms. Simmons was copied on emails regarding communications about Dr. Gottfried showing other staff members the video.  He also states that Ms. Simmons "received the confusion email from Sierra

Gottfried does not believe the decisionmakers of his termination, Dr. Watanabe and Dr.

Bajaj, had any discriminatory or retaliatory animus toward him.[49]  *Id.*, ¶ 51.

_____

Schu[c]kert, via Melissa Tuck."  *Id.*  The fact that Ms. Simmons was forwarded an email by Ms. Schuckert which stated that Ms. Schuckert was unsure why Dr. Gottfried forwarded her the video link does not support the proposition that Ms. Simmons participated in the termination decision.  Dr. Gottfried next argues that "Dr. Rebecca sent her complaints about Plaintiff to Ms. Simmons."  *Id.*  Dr. Rebecca's complaints regarding Dr. Gottfried's medical charting are a separate issue, and the fact that Dr. Rebecca reported her concerns to Ms. Simmons does not support the proposition that Ms. Simmons participated in Dr. Gottfried's termination decision.  Finally, Dr. Gottfried states that "employees knew that Ms. Simmons was in charge and could fire Dr. Gottfried."  *Id.*  Dr. Gottfried cites no support for this assertion, and the Court will not consider it.  Therefore, the Court deems it admitted that Ms. Simmons did not participate in Dr. Gottfried's termination decision.

[49] Defendants cite portions of Dr. Gottfried's deposition testimony in which he states that he does not believe that his supervisors had discriminatory animus towards him.  *See, e.g.*, Docket No. 74-1 at 20, 187:21-23 ("Q: So do you think Dr. Watanabe had any discriminatory animus towards you?  A: I don't think he did, no.").  Dr. Gottfried denies this fact, arguing that he does not know whether Dr. Watanabe and Dr. Bajaj had discriminatory animus towards him.  Docket No. 96 at 5, ¶ 51.  Dr. Gottfried cites portions of his cross-examination during his deposition.  *See id.*  Dr. Gottfried gave the following answers to questions posed by his attorney: "Q: You testified earlier that you did not think that Dr. Watanabe had discriminatory animus.  Do you know that for sure?  A: No.  Q: Similarly, did you – you testified that you did not think that Dr. Bajaj had any discriminatory animus toward you.  Do you know that for sure?  A: No, I do not."  Docket No. 76-4 at 38, 303:3-11.  Dr. Gottfried also cites a declaration in which he states that, "[u]pon reflection, I realize that Dr. Watanabe may have had discriminatory animus against me because he was motivated to terminate me because of all the trouble, complaints and expenses caused by my Parkinson's."  Docket No. 76-5 at 5, ¶ 13.  Defendants respond that Dr. Gottfried's statement that he does not know "for sure" whether Dr. Watanabe and Dr. Bajaj had discriminatory animus against him does not negate Dr. Gottfried's testimony that he did not believe either individual discriminated against him.  Docket No. 86 at 2-3, ¶ 51.  The Court agrees.  Dr. Gottfried testified that he does not believe Dr. Watanabe and Dr. Bajaj had discriminatory animus against him, and Dr. Gottfried's comments regarding his certainty do not negate his admission on this issue.  Defendants next argue that Dr. Gottfried's declaration discusses only Dr. Watanabe, and that therefore Dr. Gottfried fails to support his denial that Dr. Bajaj did not have discriminatory animus against him.  *Id.*  The Court agrees.  Dr. Gottfried provides no evidence that Dr. Bajaj had discriminatory animus against Dr. Gottfried or that Dr. Gottfried believed that she had such animus.  Finally, defendants argue that, because Dr. Gottfried's affidavit is conclusory and self-serving, it cannot create a dispute of fact.  *Id.* at 7-8 n.6 (citing *Frontrange Sols. USA, Inc. v. Newroad Software, Inc.*, 505 F. Supp. 2d 821, 829-30 (D. Colo. 2007)).  Defendants appear to argue that

Dr. Gottfried's Employment Agreement provided that either party could "terminate [the] Agreement for any or no reason by giving at least ninety (90) days written notice to the other party." *Id.*, ¶ 49. On May 19, 2022, defendants terminated Dr. Gottfried with ninety days' notice, making his termination effective August 19, 2022. *Id.*, ¶ 50. Dr. Gottfried was relieved of his duties, but continued to be employed and compensated until August 19, 2022. *Id.*

During the Colorado Civil Rights Division's ("CCRD") investigation into Dr. Gottfried's termination, defendants told the CCRD that they "made the decision to

---

Dr. Gottfried's declaration is an attempt to create a sham fact issue. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (affirming district court's refusal to consider affidavit that sought to create a "sham fact issue"). Courts consider three factors to determine "whether a contradicting affidavit seeks to create a sham fact issue: (1) whether the affiant was cross-examined during his earlier testimony; (2) whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Miller v. State Farm Mut. Auto. Ins. Co.*, No. 21-cv-00216-PAB-STV, 2023 WL 2140105, at *3 (D. Colo. Feb. 21, 2023) (citation and quotations omitted). Before applying these factors, "a court must determine whether the affidavit at issue directly contradicts the previous deposition testimony." *Id.* Here, the Court finds that Dr. Gottfried's statement, "[u]pon reflection, I realize that Dr. Watanabe may have had discriminatory animus against me," Docket No. 76-5 at 5, ¶ 13, directly contradicts his testimony that he did not believe that Dr. Watanabe had animosity towards him. Docket No. 74-1 at 20, 187:21-23. Moreover, the Court finds that the *Ralston* factors weigh in favor of finding that Dr. Gottfried is attempting to create a sham fact issue. First, Dr. Gottfried was cross-examined and was given the opportunity to clarify his testimony. Dr. Gottfried's only clarification was that he was not certain that Dr. Watanabe did not have animus against him, which is not the same as stating that Dr. Watanabe did have animosity towards Dr. Gottfried. Docket No. 76-4 at 38, 303:3-11. Second, Dr. Gottfried's affidavit is based only on his own reflection, and not on newly discovered evidence. Finally, Dr. Gottfried's prior testimony is not ambiguous, and the affidavit seeks to contradict, not clarify, Dr. Gottfried's testimony. Therefore, the Court finds that Dr. Gottfried's affidavit is not a basis to find that there is a dispute of fact regarding whether Dr. Gottfried believed that Dr. Watanabe acted with discriminatory animus. *See Ralston*, 275 F.3d at 973. For all these reasons, the Court deems this fact to be undisputed.

discharge the Complainant on May 19, 2022, because it determined that the

Complainant's stated reason for sharing the film, to discuss the film's potential

therapeutic purpose, was 'completely absent,' as the Receptionist was not involved in

patient therapy or in developing treatment programs."[50]  Docket No. 96 at 8, ¶ 24.

After Dr. Gottfried was relieved of his duties on May 19, 2022, he applied for

disability benefits.  *Id.*, ¶ 52.  On his applications, Dr. Gottfried and two of his physicians

attested that Dr. Gottfried is unable to work due to his Parkinson's disease.[51]  *Id.*  On

June 23, 2022, Dr. Gottfried was approved for short-term disability benefits with a

---

[50] Defendants argue that the Court should not consider the CCRD report
because it would be inadmissible at trial under Federal Rule of Evidence 403, which
allows the Court to "exclude relevant evidence if its probative value is substantially
outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the
jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R.
Evid. 403; Docket No. 85 at 2.  Defendants claim that the Court should exclude the
CCRD's report because it is likely to prejudice defendants by confusing the jury and
inviting them to defer to the CCRD's ultimate determination of discrimination.  Docket
No. 85 at 2-3.  However, Dr. Gottfried does not cite the CCRD for the proposition that
defendants discriminated against him or any of the CCRD's ultimate findings or
conclusions.  Rather, Dr. Gottfried cites the report for what defendants told the CCRD.
Defendants' statement is admissible under Federal Rule of Evidence 801(d)(2).  The
Court finds that Dr. Gottfried has properly supported his assertion of fact, and it is
undisputed that defendants told the CCRD that they terminated Dr. Gottfried for
showing a receptionist a video depicting rape.

[51] Defendants assert that Dr. Gottfried attested that he cannot work "with or
without accommodation."  Docket No. 74 at 9, ¶ 52.  They cite Dr. Gottfried's
applications for disability benefits and his deposition testimony.  *Id.*  However, Dr.
Gottfried testified that he is unable to work in a permanent position, although he may be
able to take short-term work as a psychiatrist, and that he requires accommodations to
work.  Docket No. 74-1 at 28, 217:15-219:9 ("Q: . . . Why can't you make 80 percent or
more?  A: Because I can do short stints.  But to extend that, I cannot do that. . . .  Q:
And have you remained disabled since then?  As defined under those policies?  A:
Maybe as defined.  But again, I was able to work if given proper accommodations.  I
could probably work a little bit longer.").  Dr. Gottfried's applications state that Dr.
Gottfried is unable to work, not that he could not work with appropriate
accommodations.  *See* Docket No. 74-24 at 1; Docket No. 74-29; Docket No. 74-27 at
8.  Therefore, it is disputed whether Dr. Gottfried can work with or without
accommodation after he was terminated.

disability date of May 20, 2022.  *Id.*, ¶ 53.  Dr. Gottfried was later approved for long-term

disability benefits, which he continues to receive based on his attestation that he is

unable to work.[52]  *Id.* at 10, ¶ 54.  Since being notified of his termination on May 19,

2022, Dr. Gottfried has been unable to perform the material duties of a psychiatrist.  *Id.*,

¶ 55.  Dr. Gottfried worked two full-time temporary positions in 2023 and 2024.  Docket

No. 96 at 8, ¶ 28.

### B.  <u>Legal Standard</u>

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if,

under the relevant substantive law, it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary judgment.

*Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict

for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by identifying a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim."

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations

---

[52] Although Dr. Gottfried denies this fact on the basis that he returned to work for
a period and that he believes he could work with proper accommodations, Docket No.
96 at 5, ¶ 54, Dr. Gottfried does not deny that he continues to receive disability benefits
based on his attestation that he is unable to work, and this fact is deemed undisputed.

omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

### C. <u>Analysis</u>

Defendants claim that they are entitled to summary judgment on all of Mr. Gottfried's claims.  Docket No. 74 at 1.  Although the parties analyze Dr. Gottfried's claims collectively, *see* Docket No. 74 at 11; Docket No. 96 at 11, the Court will consider them separately.  The Court will first consider Dr. Gottfried's wrongful termination claim under the ADA.

#### 1.  *ADA Discrimination*

"The ADA provides that no covered employer 'shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees."  *Herrick v. Vail Corp.*, No. 22-cv-00266-MEH, 2023 WL 8352449, at *12 (D. Colo. Oct. 25, 2023), *aff'd*, 2024 WL 4360502 (10th Cir. Oct. 1,

2024).  "ADA discrimination based on circumstantial evidence is analyzed under the

*McDonnell Douglas* burden-shifting framework."[53]  *Id.*

The first step of the *McDonnell Douglas* framework "requires the plaintiff to

establish a prima facie case of discrimination."  *Lincoln v. BNSF Ry. Co.*, 900 F.3d

1166, 1192 (10th Cir. 2018); *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 678 (10th

Cir. 2021) (to survive summary judgment, a plaintiff must raise a genuine issue of

disputed fact for each element of a *prima facie* case).  "To establish a prima facie case

under the ADA, a plaintiff must demonstrate: (1) that [he] is a disabled person within the

meaning of the ADA; (2) that [he] is qualified, that is, [he] is able to perform the essential

functions of the job, with or without reasonable accommodation; and (3) that the

employer terminated [his] employment under circumstances which give rise to an

inference that the termination was based on [his] disability."  *Morgan v. Hilti, Inc.*, 108

F.3d 1319, 1323 (10th Cir. 1997) (internal citations omitted); *see also Herrick v. Vail*

*Corp.*, 2024 WL 4360502, at *5 (10th Cir. Oct. 1, 2024) ("To establish a prima facie case

on his wrongful-discharge claim, Herrick had to show: (1) he was a disabled person as

defined by the ADA; (2) he was qualified, with or without reasonable accommodation, to

perform the essential functions of his job; and (3) he was fired because of his disability."

(citation, quotation, and alterations omitted)).  If Dr. Gottfried makes a showing on all the

elements of his prima facie case, "the burden shifts to the employer to articulate a

legitimate, nondiscriminatory reason" for the termination.  *Lincoln*, 900 F.3d at 1193

---

[53] Dr. Gottfried produces no direct evidence that he was fired because of his Parkinson's disease.  *See* Docket No. 96; *Kennedy v. Life Care Centers of Am.*, No. 21-cv-00706-PAB-STV, 2023 WL 155874, at *3 (D. Colo. Jan. 11, 2023) ("Direct evidence of discriminatory animus shows without inference that plaintiff was terminated because of her disability." (citation and quotation omitted)).

(internal quotation marks and citation omitted).  If defendants offer a legitimate nondiscriminatory justification for Dr. Gottfried's termination, Dr. Gottfried can prevail on his discrimination claim only by showing that defendants' stated reason for the employment action is a pretext for discrimination.  *Id.*

### a.  Prima Facie Case

Defendants dispute that Dr. Gottfried "can establish a prima facie case, specifically, that he was terminated 'under circumstances which give rise to an inference that the termination was based on [his] disability.'"  Docket No. 74 at 11 (quoting *Pathak v. Fedex Trade Networks T & B Inc.*, 329 F. Supp. 3d 1263, 1284 (D. Colo. 2018)).  They claim that "there is no evidence connecting Plaintiff's termination to his disability."  *Id.*

To show he was fired because of his disability, Dr. Gottfried must "present some affirmative evidence that disability was a determining factor in the employer's decision."  *Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1197 (10th Cir. 2023) (quoting *Morgan*, 108 F.3d at 1323).  "At the summary judgment stage, this burden is neither 'onerous' nor 'perfunctory.'"  *Id.* at 1198 (quoting *Morgan*, 108 F.3d at 1323-24).  "The plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, [he] would be entitled to judgment as a matter of law."  *Morgan*, 108 F.3d at 1324.

The Court finds that Dr. Gottfried has presented evidence that gives rise to an inference that his termination was based on his disability.  It is undisputed that Dr. Gottfried's motor and speech capabilities declined in 2021 due to his Parkinson's disease.  Docket No. 96 at 6, ¶ 4.  Dr. Gottfried had difficulties typing and dictating.  *Id.* Defendants received complaints from Dr. Gottfried's co-worker that his medical charting and signouts were hard to read.  Docket No. 74 at 4, ¶ 11; Docket No. 96 at 6, ¶ 9.  Dr.

Gottfried requested that he be provided with scribes as an accommodation for his disability, Docket No. 74 at 5, ¶ 17. Defendants trained two behavioral health specialists to work as Dr. Gottfried's medical scribes. *Id.*, ¶ 18. However, the medical scribes were unable to work Dr. Gottfried's twelve-hour shifts. Docket No. 96 at 9, ¶ 9. Moreover, despite defendants approving Dr. Gottfried's accommodation in early November 2021, Docket No. 74 at 5, ¶ 17, Dr. Rebecca stated on November 28, 2021 that she did not "see a path forward" working with Dr. Gottfried and that she was "very much done." Docket No. 96 at 6, ¶ 6. Dr. Rebecca continued to complain about Dr. Gottfried, including a complaint raised ten days before Dr. Gottfried was terminated. *Id.*, ¶ 8. These undisputed facts, viewed in the light most favorable to Dr. Gottfried, are sufficient to give rise to the inference that his Parkinson's disease was a determining factor in defendants' decision to terminate Dr. Gottfried. Because defendants do not challenge that Dr. Gottfried is disabled within the meaning of the ADA or that he was qualified to perform the essential functions of his job,[54] the Court finds that Dr. Gottfried has made a prima facie case of wrongful termination.

### b. Legitimate Non-Discriminatory Reason

Because Dr. Gottfried has made a sufficient showing that his termination occurred under circumstances giving rise to an inference of discrimination, defendants must "articulate some legitimate, nondiscriminatory reason" for firing Dr. Gottfried. *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (citation omitted). Defendants' "burden is to establish facts from which the court may infer a

---

[54] Defendants dispute whether, after Dr. Gottfried was fired, he can perform the essential function of a psychiatrist. Docket No. 74 at 10, ¶ 55. They do not argue that he could not perform his job at the time he was fired.

proper reason behind defendant[s'] decision to discharge plaintiff."  *Richardson v.
Topeka Metro. Transit Auth.*, 987 F. Supp. 887, 891 (D. Kan. 1997).  "This burden is
one of production, not persuasion; it can involve no credibility assessment."  *Carter*, 662
F.3d at 1149 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142
(2000)).  The burden has been characterized as "exceedingly light."  *Id.* (citation
omitted).

Defendants claim that they fired Dr. Gottfried because he showed co-workers a
video depicting a woman being kidnapped, stalked, and raped without sufficiently
explaining why he was showing them the video.  Docket No. 74 at 5, 9, ¶¶ 25, 47.  The
Court finds that defendants' stated reason for firing Dr. Gottfried is legitimate and non-
discriminatory, particularly because Dr. Watanabe had twice previously warned Dr.
Gottfried that offensive conduct relating to rape could result in his termination.  *Id.* at 3,
¶¶ 4, 6; *see also Cloutier v. Ledyard Bd. of Educ.*, 575 F. Supp. 3d 276, 288 (D. Conn.
2021) (teacher showing students an inappropriate video is a legitimate reason for
termination).

### c.  Pretext

Dr. Gottfried must demonstrate that there is a dispute of material fact as to
whether defendants' proffered reason for terminating Dr. Gottfried was pretextual.  "A
plaintiff demonstrates pretext by showing either that a discriminatory reason more likely
motivated the employer or that the employer's proffered explanation is unworthy of
credence."  *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016)
(quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007)).  "Pretext
can be inferred from evidence revealing weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's explanation."  *Walkingstick Dixon v.*

*Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th

Cir. 2025) (citation omitted).  "The critical question regarding this aspect of the

*McDonnell Douglas* rubric is whether a reasonable factfinder could rationally find the

employer's rationale unworthy of credence and hence infer that the employer did not act

for the asserted non-retaliatory reasons."  *Id.* (quoting *Lounds v. Lincare, Inc.*, 812 F.3d

1208, 1234 (10th Cir. 2015)).  "The plaintiff need not show both that the defendant's

reasons were a pretext *and* that the real reason was discrimination—the fact of pretext

alone may allow the inference of discrimination."  *Id.* (quoting *Doebele v. Sprint/United

Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003)).

　　　　When evaluating pretext, courts "examine the facts as they appear *to the person

making the decision*, and do not look to the plaintiff's subjective evaluation of the

situation."  *Lewis v. Peabody Rocky Mountain Servs., LLC*, 2023 WL 4927248, at *3

(10th Cir. Aug. 2, 2023) (unpublished) (quoting *DePaula v. Easter Seals El Mirador*, 859

F.3d 957, 971 (10th Cir. 2017) (quotations omitted)).  "At this stage, the relevant inquiry

is whether the employee has created a genuine issue of material fact as to whether the

employer honestly believed its proffered reasons and 'acted in good faith upon the

beliefs.'"  *Id.* (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170

(10th Cir. 2007)); *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287 (10th

Cir. 2022) ("The plaintiff must come forward with evidence that the employer didn't really

believe its proffered reasons for action and thus may have been pursuing a hidden

discriminatory agenda." (citation and quotation omitted)).

### i.    Dr. Watanabe and Dr. Bajaj

　　　　Dr. Gottfried argues that he has created a dispute of material fact as to whether it

is more likely that defendants terminated him because of his Parkinson's disease.

Docket No. 96 at 12-15.  Specifically, Dr. Gottfried relies on the following facts to

demonstrate that Dr. Watanabe and Dr. Bajaj[55] were motivated by Dr. Gottfried's

disability when they decided to fire him: Dr. Gottfried's Parkinson's disease worsened in

2021, which gave rise to complaints from Dr. Gottfried's co-workers about his medical

charting, his signouts, and the length of time he was taking in team meetings.  *Id.* at 12.

Defendants sought to minimize the clinic's costs after learning that Dr. Gottfried's

requested accommodation was not covered by insurance.  *Id.* at 13.  Dr. Gottfried's

scribes required more training.  *Id.*  Dr. Rebecca continued to complain about Dr.

Gottfried and made a complaint ten days before he was fired.  *Id.* at 12.

Even considering these facts, Dr. Gottfried has failed to demonstrate that either

Dr. Watanabe or Dr. Bajaj was motivated to terminate Dr. Gottfried because of his

disability.  Instead, the facts show that his colleagues, out of concern and a desire to

facilitate his work with other physicians, proposed that Dr. Gottfried receive an

accommodation, and that Dr. Gottfried agreed that an accommodation would be helpful.

Docket No. 74 at 4, ¶¶ 13-15.  Approximately one month after Dr. Gottfried requested

---

[55] Dr. Gottfried claims that he can demonstrate that Ms. Simmons had
discriminatory animus towards him because (1) her attitude towards Dr. Gottfried
changed after she saw him fall, (2) she made derogatory comments about his disability,
and (3) she forwarded complaints about Dr. Gottfried to Dr. Watanabe.  Docket No. 96
at 12.  As discussed above, Dr. Gottfried has produced no evidence from which a jury
could find that Ms. Simmons made derogatory comments about Dr. Gottfried.
Furthermore, he produces no evidence to suggest that her forwarding complaints made
about Dr. Gottfried by his co-workers to Dr. Gottfried's supervisor was motivated by
animus rather than a normal function of her job.  Finally, even if the Court were to find
that Ms. Simmons's change in attitude towards Dr. Gottfried is evidence that she
disliked him due to his Parkinson's disease, Dr. Gottfried has produced no evidence that
she had decision-making authority regarding his termination.  As such, if Ms. Simmons's
alleged animus is relevant to Dr. Gottfried's claims, it is under a cat's paw theory of
liability, discussed below.

an accommodation, Dr. Watanabe approved Dr. Gottfried's request.  *Id.* at 5, ¶ 17.
Although the cost of Dr. Gottfried's requested accommodation was not covered by
insurance, defendants developed a work-around and trained two behavioral health
specialists as medical scribes to provide Dr. Gottfried with immediate coverage.  Docket
No. 96 at 8, ¶ 26.  Dr. Gottfried reported that using scribes was a much more efficient
manner of providing the documentation required for caring for his patients, and he never
communicated that his accommodation was inadequate.  Docket No. 74 at 5, ¶¶ 21-22.
Finally, defendants continued to employ Dr. Gottfried for eight months after he
requested an accommodation, and maintained the accommodation even after
complaints by his co-workers.  *Id.* at 4, 9, ¶¶ 12, 50; Docket No. 96 at 6, ¶¶ 7-8.

The fact that defendants were concerned with the costs of the clinic's operation
does not support an inference that Dr. Watanabe or Dr. Bajaj held discriminatory
animus against Dr. Gottfried.  Docket No. 96 at 10, ¶ 10.  Dr. Gottfried produces no
evidence that Dr. Watanabe, Dr. Bajaj, or anyone else at Mountain Crest had concerns
about the cost of Dr. Gottfried's medical scribes.  In addition, while the fact that Dr.
Rebecca and Ms. Tuck complained about Dr. Gottfried may support an inference that
these individuals had discriminatory animus against him, *id.* at 6-7, ¶¶ 7-8, 20, their
complaints do not support the further inference that Dr. Watanabe shared their animus.
Instead, despite Dr. Rebecca's complaints in November 2021, March 2022, and May
2022, Dr. Watanabe maintained Dr. Gottfried's accommodation, and defendants
continued to employ him.  *See id.* at 6, ¶¶ 6-8.  Moreover, Dr. Gottfried asserts no facts
supporting the inference that Dr. Bajaj was ever aware of complaints about Dr.
Gottfried's Parkinson's disease.  Instead, Dr. Gottfried testified that he does not believe

that Dr. Watanabe or Dr. Bajaj had any discriminatory or retaliatory animus against him. Docket No. 74 at 9, ¶ 51.

By contrast, the undisputed facts show that Dr. Watanabe twice warned Dr. Gottfried that he needed "to immediately address his penchant for making remarks that are not appropriate," after he made a joke about rape, and that future incidents may result in his termination. *Id.* at 3, ¶¶ 6, 7. Nevertheless, Dr. Gottfried chose to discuss a video depicting a woman being raped with female colleagues, which included either sending the video to these colleagues himself or asking others to send the video. *Id.* at 5-6, ¶¶ 23, 25-28, 30. Female co-workers began complaining to their superiors that they had received a link to the video and that they were unsure why the video had been forwarded to them. *Id.*, ¶¶ 32, 33. After Dr. Watanabe heard of the incident, he took immediate action by meeting with Dr. Gottfried, *id.*, ¶ 35, contacting a Human Resources representative, *id.* at 7, ¶ 38, and interviewing witnesses. *Id.*, ¶ 40. Moreover, during these interviews, at least one female co-worker told Dr. Watanabe that Dr. Gottfried had shown her the video on his laptop and that it made her feel very uncomfortable. *Id.* at 8, ¶ 43. Furthermore, Dr. Watanabe concluded Dr. Gottfried had shown the video depicting a woman being raped to an administrative employee who "played no role in developing treatment programs for patients." *Id.*, ¶ 44. Finally, Dr. Watanabe reported to Dr. Bajaj that, despite the previous notices of conversation, Dr. Gottfried did not express remorse or understand the seriousness of showing a video depicting a woman being raped to co-workers without context. *Id.*

Dr. Gottfried argues that Dr. Watanabe and Dr. Bajaj's conduct during the investigation gives rise to an inference that they discriminated against him. Docket No.

96 at 13.  In particular, he argues that a jury could infer that Dr. Watanabe used the
investigation as a pretext for discrimination because he interviewed witnesses over a
single day and took a single page of notes.  *Id.*  Dr. Gottfried provides no facts or
explanation as to why Dr. Watanabe's investigation should have taken longer.  For
example, Dr. Gottfried does not suggest that the witnesses were unable to provide their
account of what happened during their interview or that Dr. Watanabe's investigation
required that he interview other witnesses.  *See id.*  Moreover, Dr. Gottfried cites no
facts regarding the contents of Dr. Watanabe's notes.  There is no evidence to suggest
that Dr. Watanabe's notes were not accurate or that Dr. Watanabe needed more
lengthy notes to accurately remember recent interviews.

Dr. Gottfried also argues that the fact Dr. Bajaj relied on Dr. Watanabe's
investigation supports an inference that Dr. Bajaj discriminated against Dr. Gottfried.  *Id.*
It does not.  Dr. Gottfried provides no explanation for why it was improper for Dr. Bajaj
to rely on Dr. Watanabe's investigation such that it raises an inference that this decision
was motivated by a desire to discriminate against Dr. Gottfried.  Furthermore, although
Dr. Gottfried did not verify Dr. Watanabe's facts, it is undisputed that Dr. Bajaj consulted
an independent expert on the efficacy of catharsis realism as a treatment modality for
post-traumatic stress disorder.  Docket No. 74 at 8, ¶ 45.  Lastly, Dr. Gottfried testified
that he did not believe that Dr. Watanabe held discriminatory animus against him.  *Id.* at
9, ¶ 51.

The Court finds that Dr. Gottfried has failed to show there is a dispute of fact as
to whether Dr. Watanabe or Dr. Bajaj honestly believed that Dr. Gottfried showing a
video depicting a woman being raped to co-workers was not a legitimate reason for his

termination or that they did not act in good faith upon their beliefs.  *Lewis*, 2023 WL

4927248, at *3 ("At this stage, the relevant inquiry is whether the employee has created

a genuine issue of material fact as to whether the employer honestly believed its

proffered reasons and acted in good faith upon the beliefs." (internal quotation and

citation omitted)).  As such, Dr. Gottfried has not demonstrated that it is more likely that

Dr. Watanabe and Dr. Bajaj chose to terminate Dr. Gottfried because of his disability

rather than because he showed an inappropriate video to co-workers.

### ii.    Cat's Paw

Dr. Gottfried argues that, even if he cannot show pretext by showing that Dr.

Watanabe and Dr. Bajaj were motivated by his disability when they fired him,

defendants are still liable under a cat's paw theory of liability.  Docket No. 96 at 15-16.

"Under a cat's-paw theory of recovery (also known as 'subordinate bias' or 'rubber

stamp' theory), an employer who acts without discriminatory intent can be liable for a

subordinate's discriminatory animus if the employer uncritically relies on the biased

subordinate's reports and recommendations in deciding to take adverse employment

action."  *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1032 (10th Cir. 2021) (citation

omitted).  To survive summary judgment on a cat's paw theory, Dr. Gottfried must

establish (1) "bias by the subordinates," (2) "their influence in the decision-making

process," and (3) the decision maker's adoption of a "biased recommendation without

an independent investigation."  *Rodriguez v. Brown*, 2022 WL 3453401, at *6-7 (10th

Cir. Aug. 18, 2022) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1205 (10th Cir. 2014)).

Dr. Gottfried claims that he has produced sufficient evidence to create a dispute

of fact as to whether Dr. Gottfried's co-workers, including Dr. Rebecca, Ms. Schuckert,

Ms. Weadon, Ms. Tuck, Ms. Wahlert, and Ms. Simmons, had discriminatory animus

towards him.  Docket No. 96 at 12-16.  Specifically, Dr. Gottfried argues that Dr.

Rebecca complained about Dr. Gottfried's medical charting and that Ms. Tuck

complained about the length of time he was taking in team meetings.  *Id.* at 13.  Dr.

Gottfried maintains that Ms. Simmons's animus is demonstrated by her change in

attitude after she saw Dr. Gottfried fall.  *Id.*  Dr. Gottfried contends that Ms. Schuckert's

bias towards him is shown by the fact that (1) Ms. Schuckert deleted a smiley face from

the email chain included by Ms. Wherry before she sent the How I Lost My Virginity

video to Ms. Tuck and (2) Ms. Schuckert's statement that she was unsure why Dr.

Gottfried sent her the video is contradicted by her previous conversation with Dr.

Gottfried.  *Id.* at 14.  Dr. Gottfried argues that Ms. Wahlert's animus is demonstrated by

the fact that she lied about Dr. Gottfried showing her the video.  *Id.* at 4, 14, ¶ 42.

Finally, Dr. Gottfried appears to argue that the fact that Dr. Rebecca learned the reason

for Dr. Gottfried's termination from Ms. Weadon is evidence of Ms. Weadon's bias.  *See*

*id.* at 7, ¶ 14.

Even if the Court were to assume these co-workers were biased against Dr.

Gottfried and that their reports about the video influenced the decision-making

process,[56] Dr. Gottfried has not created a dispute of fact as to the third element of his

cat's paw theory of liability, the decision maker's adoption of a biased recommendation

without an independent investigation.  *Rodriguez*, 2022 WL 3453401, at *6-7.  An

employer "may defeat the inference that an employment decision was a product of

reliance on a biased subordinate by simply asking an employee for [his] version of

---

[56] The Court notes that there are no facts to suggest that Dr. Rebecca was
involved in the investigation or that she participated in the decision to terminate Dr.
Gottfried.  Therefore, her alleged bias is not material to the Court's analysis.

events, and not relying exclusively on the say-so of the biased subordinate." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1321 (10th Cir. 2017) (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014)). It is undisputed that Dr. Watanabe conducted his own investigation into Dr. Gottfried's conduct, including interviewing Dr. Gottfried, Ms. Wahlert, and six other witnesses. Docket No. 74 at 6-7, ¶¶ 35-36, 40; Docket No. 96 at 7, ¶ 21. Although Dr. Gottfried appears to argue that he should have been interviewed after Ms. Wahlert and that Dr. Watanabe should have given more credit to Dr. Gottfried's explanation, Docket No. 96 at 12, it is undisputed that Dr. Watanabe both spoke with Dr. Gottfried and that Dr. Gottfried sent Dr. Watanabe an email explaining his conduct. Docket No. 74 at 7, ¶ 36. Moreover, although Dr. Gottfried suggests that some of these co-workers may have lied to Dr. Watanabe, the facts show that their statements to Dr. Watanabe are consistent and corroborative of each other. *See id.* at 7-8, ¶¶ 40-44.

Second, Dr. Gottfried produces no evidence that Dr. Watanabe or Dr. Bajaj discussed their termination decision with any of these individuals. Dr. Watanabe did not form an investigation committee of subordinates to provide a recommendation, but instead undertook the investigation himself. *Id.* at 7, ¶ 40. There are no facts to suggest that any of these individuals provided a recommendation for Dr. Gottfried's termination. The facts show that Dr. Watanabe consulted only with his superior, Dr. Bajaj. *Id.* Dr. Gottfried testified that he did not believe either individual harbored discriminatory animus against him. *Id.* at 9, ¶ 51. As such, there are no facts to suggest that either Dr. Watanabe or Dr. Bajaj did not independently investigate the incident or did not come to an independent and unbiased decision to terminate Dr.

Gottfried.  Accordingly, the Court finds that Dr. Gottfried has failed to demonstrate that
he can succeed on his ADA claim under a cat's paw theory of liability.

### iii.    CCRD Investigation

Dr. Gottfried claims that he can demonstrate weaknesses, and thereby show
pretext, in defendants' purported reason for terminating him by pointing to
inconsistencies between defendants' motion for summary judgment and the CCRD
investigation into Dr. Gottfried's claims.  Docket No. 96 at 14.  First, Dr. Gottfried argues
that defendants told the CCRD that their primary reason for firing Dr. Gottfried was that
he showed Ms. Wahlert the video, whereas now defendants base their rationale for
termination on Dr. Gottfried showing the video to Ms. Wahlert and several other people.
*Id.*  The Court perceives no inconsistency.  Defendants provided the same basic
rationale to the CCRD as they assert in their motion for summary judgment: Dr.
Gottfried was terminated because he showed a video depicting a woman being raped at
work.  Docket No. 74 at 9, ¶ 47.  Moreover, while the undisputed facts show that Dr.
Gottfried either sent or asked others to send the video to multiple employees, Dr.
Watanabe noted that Dr. Gottfried showing the video to Ms. Wahlert was of particular
concern because she was not a therapist and played no role in developing treatment
programs.  *Id.* at 6-8, ¶¶ 28-30, 41, 44.

Dr. Gottfried next argues that, while defendants claim that Dr. Gottfried showing
others the video was sexual harassment, "the CCRD came to a different conclusion,
finding that the video is a 'narrative screenplay,' and that the record shows it was
neither inappropriate nor unrelated to Plaintiff's duties."  Docket No. 96 at 14.  First, Dr.
Gottfried did not include any facts regarding the CCRD's conclusions in his statement of
additional undisputed facts or additional disputed facts.  Instead, Dr. Gottfried cites

evidence he uses to deny one of defendants' assertions of fact. *See id.* at 3, ¶ 25.

Therefore, this fact is not properly before the Court and is not a basis to deny

defendants' motion for summary judgment. *See* Practice Standards (Civil Cases), Chief

Judge Philip A. Brimmer, § III.F.3.b.iv. Moreover, Dr. Gottfried makes no argument that

the CCRD's probable cause determination for defendants' alleged violation of Colo.

Rev. Stat. § 24-34-402 has a preclusive effect on the Court's consideration of

defendants' summary judgment motion regarding Dr. Gottfried's ADA claim. See

Docket No. 96 at 14; *see also Marquez v. Albuquerque Pub. Sch. & Albuquerque Sch.

Bd.*, 2014 WL 12789102, at *5 (D.N.M. Aug. 28, 2014) (holding that state agency

findings did not have preclusive effect in federal court for Title VII and ADEA claims

because "unreviewed administrative determinations by state agencies charged with

investigating state-law employment discrimination claims do not preclude review in

federal court" (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 470 n.7 (1982)).

Third, regardless of the evidence presented to the CCRD, the undisputed facts

demonstrate that Dr. Gottfried sent, or asked others to send, a video depicting a woman

being raped to co-workers without context, which constitutes a non-discriminatory

rationale for his termination. Docket No. 74 at 6, 9, ¶¶ 26, 29-30, 47.

Viewing the evidence in the light most favorable to Dr. Gottfried, Dr. Gottfried

was attempting to engage co-workers in a serious conversation about the possibility of

expanding defendants' treatment programs to include a therapeutic technique whereby

patients artistically recreate traumatic events. Nevertheless, Dr. Gottfried either sent or

asked others to send a video depicting a woman being raped to certain colleagues

without context. Several recipients found the video to be disturbing and complained.

Dr. Gottfried has been disciplined on two previous occasions about inappropriate workplace conversation involving rape, and had been warned that future violations could lead to termination. Yet, instead of being deterred, he had again inappropriately brought up rape to co-workers. The Court finds that Dr. Gottfried has failed to demonstrate that a reasonable jury could find that defendants' reason for termination was a pretext for firing Dr. Gottfried because of his Parkinson's disease. Therefore, the Court will grant that portion of defendants' motion seeking summary judgment on Dr. Gottfried's wrongful termination claim under the ADA.

### 2. ADA Retaliation

"The ADA's retaliation statute provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Lincoln*, 900 F.3d at 1209 (quoting 42 U.S.C. § 12203(a)). Dr. Gottfried's ADA retaliation claim is subject to the same *McDonald Douglas* burden-shifting framework. *Herrmann*, 21 F.4th at 679. Dr. Gottfried must first show that he has a prima facie case of retaliation under the ADA. "A prima facie case of retaliation under the ADA requires the plaintiff to show that he (1) engaged in protected activity; (2) suffered a material adverse action; and (3) a causal connection exists between the protected activity and the adverse action." *Branch v. United Parcel Serv.*, No. 18-cv-03358-PAB-KLM, 2022 WL 356822, at *10 (D. Colo. Feb. 7, 2022), *report and recommendation adopted*, 2022 WL 579539 (D. Colo. Feb. 25, 2022). "To establish a causal connection, a plaintiff must present evidence of circumstances that justify an inference of retaliatory motive." *Lincoln*, 900 F.3d at 1209 (emphasis, alteration, and

citation omitted).  "The Supreme Court has likened this burden to a showing of 'but-for causation.'"  *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "The evidence of but-for causation must be based on more than mere speculation, conjecture, or surmise."  *Id.* (citation omitted).

The Court finds that Dr. Gottfried has made a sufficient showing on the first two elements of his prima facie retaliation claim.  "Protected activity includes requesting an accommodation."  *Aubrey v. Koppes*, 975 F.3d 995, 1015-16 (10th Cir. 2020).  It is an undisputed fact that Dr. Gottfried requested an accommodation for his Parkinson's disease on September 27, 2021, and the request was approved in early November 2021.  Docket No. 74 at 5, ¶ 17.  It is also undisputed that Dr. Gottfried was fired on May 19, 2022.  *Id.* at 9, ¶ 50.

Dr. Gottfried claims that he can demonstrate a causal connection between his request for accommodation and his termination.  Docket No. 96 at 16.  Dr. Gottfried argues that, although defendants initially tried to accommodate Dr. Gottfried, Ms. Simmons and Dr. Watanabe received complaints from Dr. Rebecca about his medical charting.  *Id.*  Dr. Gottfried asserts that defendants were concerned about the cost of Dr. Gottfried's accommodations.  *Id.*

The Court finds that Dr. Gottfried has failed to demonstrate that defendants fired Dr. Gottfried because he requested an accommodation.  First, defendants initiated the process of putting in place accommodations for Dr. Gottfried.  Docket No. 74 at 4, ¶¶ 14-16.  Second, although Dr. Rebecca continued to complain about Dr. Gottfried's medical charting, Docket No. 96 at 6, ¶¶ 6-8, the evidence does not show that Dr. Watanabe withdrew the accommodation, believed the accommodation was

unsuccessful, or disciplined Dr. Gottfried.  Dr. Gottfried never indicated that his accommodation was inadequate and affirmatively stated that the scribes were helping him complete his medical charts.  Docket No. 74 at 5, ¶¶ 21, 22.  Finally, Dr. Gottfried made his request for accommodation eight months before he was terminated, and he had been using the scribes for at least five months before he was fired.  *Id.*, ¶¶ 17-19.  Because his accommodation request was not made close in time to his termination, Dr. Gottfried cannot rely on temporal proximity to establish causation.  *Hueston Green v. Garland*, 717 F. Supp. 3d 1070, 1082 (D.N.M. 2024) ("A period of more than three months is insufficient to establish an inference of retaliatory motive." (citing *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (explaining that "if the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element")).  Therefore, Dr. Gottfried has not made out a prima facie case of retaliation under the ADA.[57]

However, even if the Court were to find that Dr. Gottfried has made a prima facie case of retaliation, Dr. Gottfried relies on the same arguments that the Court has rejected to show pretext.  *See* Docket No. 96 at 17 ("Plaintiff's pretext evidence presented in his discrimination case, discussed in Section B above, also applies to his retaliation claim.").  Therefore, Dr. Gottfried's retaliation claim would fail for the same reasons as his wrongful termination claim.

---

[57] There is no inconsistency in the Court finding that Dr. Gottfried has made a prima facie case of wrongful termination, but not a prima facie case for retaliation.  For Dr. Gottfried's retaliation claim, the Court considers whether his request for accommodation caused his termination, which is not the same as determining whether there is an inference that Dr. Gottfried's disability motivated defendants' decision to fire him.

### 3. Dr. Gottfried's Remaining Claims

Both Dr. Gottfried and defendants assert that Dr. Gottfried's claims for

employment discrimination and retaliation under CADA, as well as his § 504 claim

under the Rehabilitation Act, employ the same legal standard as Dr. Gottfried's ADA

claims. *See* Docket No. 74 at 11 n.4 ("Disparate treatment claims under the ADA,

CADA, and Rehabilitation Act employ the same burden-shifting analysis and may be

simultaneously analyzed."); Docket No. 96 at 11 ("In circumstantial evidence

discrimination cases, courts apply the requirements of the burden shifting principles set

forth in *McDonnell Douglas Corp. v. Green*."). The Court agrees that the same standard

applies to Dr. Gottfried's claims brought under ADA, § 504, and CADA. *Green v. U.S.*

*Anesthesia Partners of Colorado, Inc.*, 624 F. Supp. 3d 1201, 1210 (D. Colo. 2022),

*aff'd*, 2023 WL 7015660 (10th Cir. Oct. 25, 2023) ("Disparate treatment claims under the

ADA, CADA, and the Rehab Act all employ the same burden-shifting analysis, and thus,

the Court will consider Dr. Green's claims under all three statutes simultaneously."

(citing *Aubrey v. Koppes*, 975 F.3d at 1004 n.4 ); *Crowe v. ADT Sec. Servs., Inc.*, 649

F.3d 1189, 1195 (10th Cir. 2011) ("This framework applies to both discrimination and

retaliation claims."). Moreover, both parties present their arguments as part of a single

analysis for all of Dr. Gottfried's claims. *See* Docket No. 74 at 10-18; Docket No. 96 at

10-18. The Court has found that Dr. Gottfried has failed to demonstrate that a

reasonable jury could find that defendants discriminated against him under the ADA.

The Court's reasoning applies equally to Dr. Gottfried's CADA and § 504 claims.

Therefore, the Court will grant defendants' motion for summary judgment.[58]

---

[58] Whether to exercise supplement jurisdiction over a state law claim "is in some
measure discretionary." *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 31

### III.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 74] is

**GRANTED**.  It is further

**ORDERED** that Defendants' Motion to Strike Evidence and Exhibits Submitted by

Plaintiffs in Response to Defendants' Motion for Summary Judgment [Docket No. 85] is

**DENIED**.  It is further

---

(2025).  Under 28 U.S.C. § 1367, "a district court 'may decline to exercise supplemental jurisdiction' in three specific situations: (1) if the supplemental claim 'raises a novel or complex issue of State law'; (2) if the supplemental claim 'substantially predominates' over the claims within the court's original jurisdiction; and (3) if the district court 'has dismissed all claims over which it has original jurisdiction.'"  *Id.* at 31-32 (quoting 28 U.S.C. § 1367).  A district court "should normally dismiss supplemental state law claims after all federal claims have been dismissed."  *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002).  Although "it often makes sense on comity and federalism grounds to remand state law claims if all the federal claims have been dismissed," the Tenth Circuit has "suggested that it is appropriate, perhaps even advisable, for a district court to retain supplemented state claims after dismissing all federal questions when the parties have already expended a great deal of time and energy on the state law claims." *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 107 F.4th 1121, 1141 (10th Cir. 2024).  In determining whether to continue to exercise supplemental jurisdiction, "the district court must consider the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness."  *Id.* (citation and quotation omitted).  The Court finds that the nature of defendants' summary judgment motion, which seeks summary judgment on all of Dr. Gottfried's claims, weighs in favor of exercising supplemental jurisdiction over Dr. Gottfried's CADA claim.  In addition, as discussed above, the parties agree that the factual disputes and legal arguments are the same for Dr. Gottfried's state law claim as his federal claims, and it would be a waste of judicial resources for a state court to resolve identical issues.  Moreover, the Court finds that fairness considerations weigh against allowing Dr. Gottfried to refile his state law claim after defendants have successfully defended against identical federal claims.  Finally, time and cost considerations for both parties warrant the Court exercising supplemental jurisdiction.  Under the circumstances of this case, where Dr. Gottfried's state law claim relies on the same facts and legal standard as his federal claims, the Court will exercise its discretion to retain jurisdiction over Dr. Gottfried's state law claim and resolve the claim on the merits.

**ORDERED** that plaintiff Joseph Gottfried's claims against defendants University of

Colorado Hospital Authority, Poudre Valley Medical Group, Inc., and Poudre Valley

Health Care, Inc. are **DISMISSED with prejudice**.  It is further

**ORDERED** that this case is closed.


DATED September 25, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge